Lend Lease Construction v. Administrative Employer Services Ms. Gerten Good morning, and may it please the Court, I am Teresa Gerten for the Plaintiff Appellate, Lend Lease, U.S. Construction, Inc. I am here today seeking reversal of the District Court's judgment dismissing Lend Lease's complaint, or in the alternative, seeking reversal of the denial of Lend Lease's Rule 59 motion, which would allow it an opportunity to replete its complaint following dismissal. Lend Lease's complaint was sufficiently pled against both Defendant Appellee's Technology Insurance Company, or TIC, and Administrative Employer Services, or AES. At its core, this case is a workers' compensation insurance dispute. Lend Lease was the construction manager on a project and provided a Contractor Controlled Insurance Program, or CSIP, to its enrolled subcontractors, which included workers' compensation insurance. Now, forgive me, but based on what you know, was Midwest a party to the technology insurance policy that AES obtained? And did that policy cover Midwest's workers on this project? That is Lend Lease's allegation, Your Honor. The policies are not a part of the record and have not been presented to this Court. However, that is the, upon information and belief, that is what Lend Lease alleges. Now, why wouldn't they have been presented to us? Well, Your Honor, we didn't have a copy of that policy when we filed the suit. I can't say why they haven't become part of the record at this point. Now, you did append certain contracts, however. That is correct. And between your client and the insurer, and between your client and the primary subcontractor? Correct. We have included as exhibits contracts between Lend Lease and their primary subcontractor, Civez, and the subcontract between Civez and Midwest Steel, as well as the contract between Midwest Steel and AES. Okay. Now, was there any sort of provision in the CCIP or in any agreements between Lend Lease and the various subcontractors that would have required Midwest to disclose that it had independent insurance coverage, in addition to whatever coverage was provided by the CCIP? Yes. The CSIP insurance manual that was incorporated into all the subcontracts required that all additional sub-subcontracts be reported to Lend Lease so that they could be appropriately vetted and included in the CSIP. It is our contention that the existence of the relationship between AES and Midwest Steel was not informed, that Lend Lease was not informed of that, and thus couldn't make provision for the fact that there were temporary or leased workers working for Midwest Steel on the project. Lend Lease, you didn't like your $500,000 deductible. Why didn't you get more insurance? It's not a matter of whether or not we had more insurance, Your Honor. That's the way the program is set up. It's the fact that there's different risk associated with leased employees,  the administrative procedures that sit behind the insurance program work properly. But your contracts with your sub didn't provide for any sort of reimbursement with respect to the deductible, is that right? That's correct. Wouldn't we expect to see that there would be, in fact, a provision in the contract, if you expected, some kind of reimbursement from your subcontractors? Well, I think the difference here, Your Honor, is that in this case, we're alleging that Lend Lease is actually acting as the insurer because it has that $500,000 deductible. And there's the case law that says that. What is that? Forgive me, but that is absolutely my question. Lend Lease was required to pay the $500,000 deductible. But why does that render it a coinsurer for purposes of a contribution claim? Sure. The answer to that question is that there's no case law, first of all, that really directly addresses this issue on point that I could locate. Of course not, because there isn't any basis for what you're arguing. However, I do think that there is case law that says that the insured retains its own separate legal interest in the amount of its deductible, even where the insurer pays the remainder. And there's a case, the Sovereign Chemical case, where the insured only paid a $25,000 deductible, but was still able to bring a claim for close to $500,000 without the participation of its insurer to recoup the entire loss. So that's essentially what you're saying. But even if we treat Lend Lease as an insurer, say, along with CV Star, mustn't you allege that they were insuring the same party and the same risk? Yes. As technology in order for there to be a valid claim for contribution? Yes. That is absolutely part of the requirements for pleading that you have to allege concurrent coverage. We feel that we have alleged that, at least when you read everything in total with each other. But that being said, if we haven't alleged that, we think that that's easily corrected if we're allowed to replead. That it's just a matter of the technical wording of the complaint, and that's something we could easily fix. What is it you want to allege? Her suggestion was that we might not have clearly alleged concurrent coverage, and I'm saying that we could spell that out. What do you mean by concurrent coverage? Meaning that the two policies insured the same parties for the same time period for the same risk. And I think that we have alleged that because we've alleged that both policies, the STAR policy and the TIC policy, cover Midwest Steel for injuries to Midwest Steel's workers. But how does that cover Lend-Lease? The CVSTAR workers' comp policy was actually issued to Midwest Steel. So the contention is that Midwest Steel has a policy through CVSTAR and through a technology insurance company. Where does Lend-Lease come into this? Lend-Lease sponsored the contractor-controlled insurance program and was responsible for the first $500,000 of any claim, which we are saying gives us the right to bring a contribution claim. Well, that's what I don't understand. You're responsible for the first $500,000. Just as an insurer. You could have insured against it. You didn't. I don't understand why that gives you any right against another insurance company. Just as one insurance company has a right to bring a contribution claim against another insurer, we're alleging that we have that right, because otherwise we would be entirely beholden to our insurer, STAR, to bring a claim for contribution when it has no incentive to do so for losses that are within the deductible. But you could have provided by contract that you would be reimbursed by your subcontractors for losses. They occurred. You didn't do that, though. I don't think that was necessary, because we're not seeking reimbursement from our subcontractor. We're seeking contribution from the insurance company. So by law, the argument is that we have the ability to seek contribution. Why? Because we are essentially the insurer for purposes of this dispute. I don't understand. You're not an insurer. You agreed to have a $500,000 deductible. That means you were responsible for that $500,000, not anybody else. I understand that. I think the distinctive point is that STAR could bring a contribution claim against TIC because insurers have rights to bring contribution actions. My point is that because we have such a large obligation, we act as STAR for purposes of this claim, because STAR has no incentive to bring a claim when it isn't out of pocket any money. This is all Lend-Lease's money, and thus it should have recourse. What do you mean Lend-Lease's money? Where is the authority for the notion that someone becomes a co-insurer for purposes of a contribution claim through payment of a deductible? Where is that authority? As far as I can tell, there's no authority either way. Opposing counsel can't cite to any cases that deprive us of that right. But I have found at least one case from the Northern District of Illinois, the sovereign chemical case, which says that we have an independent legal right to bring a claim for the amount that we've paid out of our deductible. So you're, of course, as I understand it, you think Illinois law applies here. Am I right? That's correct. So you're really asking us to make it law, aren't you, for Illinois? I think so because there's no law on this issue. I'm not asking you to overturn any law or change any law, just that this should be a recognized cause of action. Was this case originally brought in the state court? No, Your Honor. It was originally brought in the Southern District of New York but was transferred to Northern District of Illinois. I do recall that now, yes. So we've talked about the contribution claim. I just want to wrap up quickly so that I can finish my thought here. But our main position is that the motion to dismiss was improperly decided and that we should have an opportunity to pursue our claims on the merits, that they were properly pled. That being said, if the court agrees that the motion to dismiss was properly granted, we don't think this is a special circumstance that warrants dismissal with prejudice. We think we should have an opportunity to replete our complaint, to bring in Starr if that is indeed the case that they're a necessary party. Thank you. Look, you had three opportunities to plead viable claims here. Why are the circumstances so compelling as to show that Judge Durygian abused his discretion in not allowing you to file a fourth complaint? Well, I will say the original complaint that we filed just was just a misnamed defendant, so I don't feel that that one should necessarily count against us. This is the first time that. Of course it should count. Everything counts against you. Of course. You know, it's sort of three strikes and you're out. I think, you know, originally we had to do an investigation into who the proper defendant was. We didn't have the right information, and that is why we sued the wrong defendant. However, they're related, the defendants. The point that I'd like to make is just that substantively no court has looked at our complaint yet, so I think that gives us, you know, a basis to argue that we should get a chance to repeal. How big is Lend-Lease? Is it a big company, a little company? It is, Your Honor. It's a large company. What do you mean it is? I asked you, is it a big company or a little company? I'm sorry. I misheard you. It is a big company. Well, it ought to be able to take care of itself, as Judge Ripple said, with contracts. You make a contract if you want to have a claim against an insurance. You know, if you want to insure all your losses, you have to make contracts. Okay. Well, thank you, Ms. Griffin. Thank you. Mr. Lugace? Good morning, Your Honors, and may it please the Court. My name is Kevin Lugace, and I am counsel for Defendant Technology Insurance Company. I'd like to address a couple of the points that were raised already by the Court. The first is that we actually, during the initial pleading stage, provided a copy of the technology policy to Lend-Lease. So Lend-Lease had a copy of the policy. This is outside of the pleadings, but they knew that the policy didn't include Midwest as an insured. If you look at the Second Amendment complaint, you will see that it does not plead that Midwest is an insured under the technology policy. What it limits it to is that the technology policy was issued to AES. Could you tell us about the policy that technology issued to AES? In other words, was this policy meant to cover Midwest Steel's employees? And if it was, why wasn't Midwest a party to the policy? Sure. AES is actually what's known as a PEO, which is a professional employer organization. As a PEO, what AES does is it's basically a human resource back office for all of its clients. In some instances, it provides work comp. In other instances, it simply does payroll. In this case with Midwest, there is a dispute about which contract is applicable. But what I can tell you about this single instance is that technology or AES was not actually providing work comp for Midwest in this instance, especially with respect to these workers. And that's why Midwest was not on the policy because at the end of the day, the relationship that was going on between Midwest and AES, where AES was providing these back office human resource services, it didn't include work comp. And it certainly didn't include it for these specific employees. What was in place for these employees was the STAR policy. Midwest signed on to the CCIP. It got a policy from STAR. The claim came in. STAR responded to the policy. I mean what we have here essentially is a multinational, large construction management company that's worth in the hundreds of millions of dollars. They do work all over the United States, originally based in Australia. They knew going into this that they wanted a $500,000 deductible per claim. They signed on to a written agreement for that because presumably that lowered their premium. And now what they're trying to do is they're trying to essentially get out of paying the deductible because they see that there was this separate arrangement between AES and technology. Now when you look at the contribution claim under Illinois law, there's clear law on this. The law is either through HOME under the Illinois Supreme Court, which allows an equitable contribution claim in insurer versus insurer disputes, or it's Flynn v. Levy. And in Flynn v. Levy, they say, well, there may be an equitable contribution claim outside of an insurer versus insurer dispute, but that's limited to a joint financial undertaking that's either prescribed by a contract or a statute. AES has pled nothing because there was no pre-tort or even a post-tort relationship between – excuse me, Lend-Lease has said nothing because there was nothing between Lend-Lease and AES or Lend-Lease and technology. So there's no basis for an equitable contribution. Did the policy provide workers' compensation coverage to Midwest Steel's workers on this particular project? It did not. Oh, okay. It did not. So as to whether – Would Midwest Steel need or want additional compensation coverage if it was already covered through the CCIP? Based on my experience in working in work comp, once you have one work comp policy in place, that's generally sufficient under the law because the policy has to conform to the way the law works. So they had sufficient coverage through the STAR policy to cover this claim, this accident and the workers who were injured. There's no allegation that the STAR policy isn't completely paying for the claim or covering the claim. In fact, it is. I think one fact that the court should be aware of is just a couple of weeks ago, STAR went ahead and filed its own action against technology and AES. That's pending in state court right now. So essentially what we see here is STAR is essentially dissing itself from Lend-Lease. Lend-Lease isn't a party to that action. STAR isn't claiming any rights that it's pursuing on behalf of Lend-Lease. So STAR is pursuing a contribution claim, presumably as an insurer versus insurer under Illinois law. The question that Lend-Lease is presenting to you is, hey, do we have that kind of claim because we have a deductible obligation? The court noted there is no law, and in fact, I have found absolutely no law. But what I would say is if you just simply look at the pleading itself, the Second Amendment complaint, you can see they have pled themselves out of an insurer versus insurer contribution claim. First off, they're not an insurer. They're a construction management company. Second, when you look at the risk that is being insured, the named insurer, on the one hand, they specifically plead. It's Midwest under the STAR policy, and it's AES under the technology policy. So you don't have a commonality in the risk. As to the actual risk being covered, the interest under the policy, they say that the STAR policy was issued as part of the CCIP wrap-up, and they explicitly plead. As part of what? As part of the CCIP wrap-up. What does that mean? It's part of a construction project. What they do is they'll have like a wrap-up insurance plan that will issue work comp policies to subcontractors so they can control what happens. And that's STAR? That's STAR, correct. And that was prearranged with Lend-Lease. I mean that was basically the benefit of the bargain when Lend-Lease went in here. They understand how do we keep our premiums down. They understand the risks that come in and how much work comp is going to be paid out. So this was something that they put together in advance, and I'm sure they do it on all their construction projects here. Now, the technology policy goes and covers AES. So what you see here, and that's outside of the CCIP. So what you see here is the interests are different. The insureds are different. And in one case, we don't even have an insurer. So the contribution claim under a home isn't even there. And then what they do. Talk to me. I'm sorry to keep interrupting you. No, no, it's fine. But would you talk to us about why paying a deductible is different from self-insuring for purposes of being a co-insurer on a contribution claim? In other words, isn't Lend-Lease essentially saying we rather than CVSTAR will be responsible for the first half million or 500,000, yeah, in damages? And shouldn't that out-of-pocket cost give it the right to go after another insurer that insured the same risk? First off, sure. Insurance generally creates a relationship between an insurance company and an insured. And in some instances, that's considered some type of fiduciary relationship. Under a lot of states' laws, including Illinois, that gives kind of an equitable right when a carrier has paid what they feel is more than they should have for a claim. Here, what we have is an entirely different animal. What we have is a construction management company that agreed under a contract to pay a $500,000 deductible on a per-claim basis because it made good business sense for them. They don't have any relationship whatsoever with the subcontractor or with the workers that would be considered fiduciary in any sense. So we have a business entity that's making business decisions because that's good for their bottom line versus STAR, which is an insurance company, which is essentially entering into a quasi or whatever fiduciary relationship to provide a specific coverage that conforms with Illinois law. I mean in my view of things, these are very different animals. They agreed to pay that first $500,000 simply because it made good business sense. STAR is essentially agreeing to provide the benefits that are required under Illinois law. And so the relationship is different. The duties are different here at the end of the day. So we see these as very different kind of creatures, I guess. Have you ever seen a case quite like this? I have not. In your experience? I have not, Your Honor. I've never seen a case like this, to be frank. And how many years have you been doing this? For about 10 years. About 10 years. I do a lot of work in Illinois, but I also do a lot of work throughout the country. Generally what you see is the real question is how many deductibles will apply? Or, you know, and SIR is a slightly different piece, but generally the question is are there multiple occurrences, a single occurrence so we can determine how many? One of the cases here, and it's NICOR, and we cited it in our brief, in that case the question was the insured agreed to a per-occurrence deductible and only wanted to pay one deductible. And in that case there was 195 occurrences, and they were trying to get out of paying 195 deductibles. And the Illinois Supreme Court said, hey, you're a sophisticated business entity. You entered into this arrangement. You've got to, you know, stick with what you entered into. This is the benefit of the bargain. It went bad for you, but that's life. That's what you agreed to. I'm not sure how this is any different. Okay. Thank you, Mr. Rogash. Thank you. Mr. Rothman. Good morning, Your Honors. I am, may the Court please, Dennis Rothman representing AES. The district court's dismissal of the second amended complaint against AES was correct and should be affirmed because AES did not receive a benefit at plaintiff's expense that would support an unjust enrichment claim, which was the only claim pleaded. The order denying the 59E motion was likewise correct. After a third complaint is dismissed, a plaintiff should not be allowed after judgment is entered. A fourth complaint that adds a plaintiff, adds a defendant, completely changes all the claims and adds to the claims when all the potential claims and all the potential parties were known before the first complaint was even filed. The unjust enrichment claim in the second amended complaint, which plaintiff would abandon if it's rule 59E motion were to be permitted and it's fourth complaint to go forward, claims that AES received lower workers' compensation premiums and was freed from paying deductibles by omitting Midwest Steel from the AES workers' comp policy with TIC. What plaintiff is complaining about. What did the contract between AES and Midwest provide with respect to insurance coverage? Was AES required to provide workers' compensation coverage even if Midwest was participating in an insurance program like the CCIP that governed this project? It did not. The agreement required that AES obtain coverage. If that coverage was obtained by Midwest, its obligation was satisfied, Your Honor. And in fact, here, for these workers at this project, it was satisfied through Midwest's mandatory subscription to the CCIP. Double coverage is not called for. Uh-huh. The grievance, plaintiff's grievance here is that events unfolded exactly the way the plaintiff cast out for itself. The CCIP paid the premium it contracted to pay. It's paid the deductible it's contracted to pay. Star, the comp carrier under the CCIP, picked up the comp obligation over and above the deductible. Everyone paid what they were supposed to pay, and the workers were covered. So Midwest got exactly what it had bargained for. But this plaintiff isn't content with having its own bargain fulfilled. It wants to pay less. And in what looks to us like simple opportunism, the opinion below, I think, correctly characterizes it as plaintiff trolling far and wide for someone else to share the burden. That it agreed to bear. Plaintiff found AES in that search. And AES isn't even a contractor, subcontractor, or sub-subcontractor on the Riverpoint project. And that's the foundation for the unjust enrichment claim. We're suggesting to the court, as we suggested below, that when the plaintiff's contractual expectations are met, then the economic consequences are exactly what the plaintiff bargained for. The plaintiff hasn't suffered a loss, and AES has surely not been enriched unjustly, so that even if AES did pay a lower comp premium, even if AES was freed from a deductible on the account of the four Midwest workers injured at Riverpoint, there's no injustice that gives rise to a remedy. That comports with Illinois law, expressed in SAILTECH and HPI, which appear at 12, 13, 14, 15 of our brief. It comports with Michigan law, so no matter which law applies, there's no injustice and there's no unjust enrichment. Kurraus, the Michigan case that we discussed of some length, says, a third party is not unjustly enriched when it receives a benefit from a contract between two other parties where the party benefited has not requested the benefit or misled the other parties. The mere fact that a third person benefits from a contract between two other persons does not make such third person liable in quasi-contract unjust enrichment or restitution. They might as well have been writing for this case. Mr. Rothman, what law do you think applies? Our position has always been that in the first instance, it doesn't matter because you reach the same result under either, and that Michigan law is the more likely law to apply because AES and Midwest made their contract in Michigan. They're based in Michigan. Their expectations were formed by Michigan law. So on that particular claim against Jerkline, you think Michigan law would apply? Yes, sir. Under New York State choice of law rules? Under? Under New York State choice of law rules. Yes. This case was transferred. Yes, sir. The opinion below that says that it's not enough to allege that AES, and a quote from about page 12, somehow benefited in a tangential manner, that that's not enough. The opinion is correct. Recovery by this plaintiff against AES in this circumstance would be a windfall. As to the Rule 59E motion, not only was the district court correct in denying it, it was correct in denying it without extensive briefing. The 59E motion raises no newly discovered evidence that could have been found before. It alleges no manifest error of law by the district court. It admits that the district court opinion was correct, and it proposes to plead around its errors and fix the mistakes in its second amended complaint by changing the claims and adding parties in the third amended complaint, adding plaintiff, adding a defendant, changing all the claims, but it doesn't assert anything of importance that was unavailable before the very first filing. The plaintiff does cite two cases in its reply brief. Okay. Thanks, Mr. Hoffman. Thank you. That's enough. So, Ms. Skirton, do you have anything further? So, in effect, you want more insurance. You're going to pay for it? What premiums are you going to pay for this additional insurance? In effect, we would like... What are you going to pay? You want another $500,000 insurance. We want to share the... What are you going to pay for it? You're going to pay for insurance, not free. Of course. Your Honor, we want contribution with the... What are you going to pay for this extra $500,000 in insurance? It is... You didn't answer my question yet. We're not going to pay for it. You're not going to pay a cent. That being said... Well, you're not entitled to it either. I don't... You don't get insurance for nothing. Of course not. But carriers bring contribution claims against each other all the time, and they don't pay each other for that benefit because of the contracts and the situation. You're just asking for insurance. You didn't get enough insurance. I don't... You had a $500,000 deductible. Now you want to treat that as insurance. Well, I will say... You want TIC to pay you. TIC is an insurance company, but you're not going to pay it for the insurance that you want from it. No, because we believe that we're entitled to it. I think at the crux... Well, you're not entitled to it. What is the... What possible... What have you done to earn it? I think at the crux, the issue is that there's the consolidated insurance program... You have done nothing to earn the money you're seeking. I disagree because I think we set up our contracts, and we set up our contracts... What have you done to earn the $500,000? We put in our contracts that everybody is supposed to report to us when they sub-subcontract so that we can appropriately structure our risk. And the failure to do that has led to this situation. Structure your what? Structure our risk. So the failure to do that... The contractor-controlled insurance program is a very fully vetted, complex insurance program. So I think we put into our contracts... So who is it who failed to tell you about the risk? Midwest Steel and, by extension, AES, failed to tell us about the existence of their relationship, which predated the CSIP. And thus, we were unable to enroll AES in the CSIP or exclude them or take credits for them or come up with some financial method for dealing with the existence of their contract. Okay. Thank you. Thank you. Thank you to all counsel.